Phillip Chan (SBN 263907)
Phill.chan@gmail.com
P.O. Box 688
Sacramento, California 95609
Telephone: (916) 396-9496

Pro Se

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIP CHAN, an individual, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| VAXART, INC., a Delaware corporation; CEZAR ANDREI FLOROIU, an individual; WOUTER W. LATOUR, M.D., an individual; STEVEN J. BOYD, M.D., an individual; KEITH MAHER, M.D., an individual; and ARMISTICE CAPITAL LLC, a Delaware limited liability company, | ((1) Violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5, and (2) Violation of Section 20(a) of the Exchange Act) |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff PHILLIP CHAN ("Plaintiff") brings this action against Defendants VAXART, INC. ("Vaxart" or the "Company"), CEZAR ANDREI FLOROIU, WOUTER W. LATOUR, M.D., STEVEN J. BOYD, M.D., KEITH MAHER, M.D., and ARMISTICE CAPITAL LLC. Plaintiff alleges the following based upon his personal knowledge and upon information and belief as to all other matters. Plaintiff's information and belief is based on the ongoing

1
COMPLAINT

independent investigation, which included a review of the Defendants' publicly-available documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vaxart, analysts' reports and advisories about the Company, and information readily-obtainable on the Internet.

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

2. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  At all relevant times, Vaxart conducted business in this District and maintained its headquarters in this District at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

3. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

**PARTIES**

4. Plaintiff sold Vaxart common stock short and purchased shares during the time period from June 25, 2020, to July 25, 2020 (the "Time Period") and was damaged by Defendants' conduct alleged herein.

5. Defendant Vaxart is a corporation organized under Delaware law and headquartered at 385 Oyster Point Boulevard, Suite 9A, South San Francisco, California 94080. Vaxart's stock trades on the NASDAQ, which is an efficient market, under the symbol "VXRT".

6. Defendant Cezar Andrei Floroiu ("Floroiu") has served as a director of Vaxart since April 2020.  In June 2020, Vaxart appointed Floroiu as its new Chief Executive Officer.

7. Defendant Wouter W. Latour, M.D. ("Latour") served as Vaxart's President and

Chief Executive Officer from February 2018 to June 2020. He has also served as a member of its Board of Directors from February 2018 to the present. Latour was appointed as Chairman of Vaxart's Board of Directors in December 2019 and continues to serve in that capacity. Before going public, Latour held various executive positions at Vaxart's predecessor entity, including President and Chief Executive Officer and sat on its Board.

8. Defendant Steven J. Boyd ("Boyd") has served as a director of Vaxart since October 2019. Since 2012, Boyd has also served as the Chief Investment Officer of Defendant Armistice. Boyd is Armistice's Managing Member and its founder, principal and owner.

9. Defendant Keith Maher, M.D. ("Maher") has served as a director of Vaxart since October 2019. He is a member of Vaxart's Compensation Committee. He has also served as Armistice's Managing Director since 2019.

10. Defendants Boyd and Maher are referred to as the "Control Defendants".

11. Defendants Floroiu and Latour are collectively referred to as the "Executive Defendants".

12. Defendant Armistice Capital LLC ("Armistice") is a hedge fund incorporated in Delaware. At relevant times hereto, it conducts and has conducted business in California in connection with its ownership of over 30% of the shares of Vaxart and its representation on and participation in the meetings of and actions of the Board of Directors of Vaxart by two of its principals, Defendants Boyd and Maher.

13. The Control Defendants and Executive Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Vaxart's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive

representations which were being made were then materially false and/or misleading. The Control Defendants and Executive Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the collective actions of the Control Defendants and Executive Defendants.

## **GENERAL ALLEGATIONS**

**A.    Background**

14.     At the end of 2019, Vaxart was a company with 14 employees. It has never successfully developed a drug or vaccine. With the COVID-19 pandemic, and the rush of the government to provide funding for and contracts to companies with promising vaccines and cures, Defendants saw an opportunity to cash in on the scientific naivety of investors and politicians.

15.     Throughout early 2020, Defendants made overly optimistic statements about their work on a vaccine for COVID-19 and watched their stock increase from just $0.35 at the beginning of 2020 to above $3.19 in May 2020 after the federal government announced Operation Warp Speed ("OWS"). OWS promised to commit massive amounts of funding to companies developing COVID-19 vaccines.

16.     Defendants saw the OWS announcement to further inflate their stock price with misleading positive statements with the intent to sell shares immediately afterwards to make a profit . . . a classic "pump and dump" scheme.

17.     On June 3, 2020, it was publicly reported that the federal government would provide significant financing to seven companies selected for OWS. The identity of five of those companies was disclosed at that time, but two were not. Vaxart was not one of the identified OWS companies.

18.     On June 8, 2020, in furtherance of Defendants' scheme, Defendants amended Armistice's existing warrant agreements, allowing Armistice to potentially exercise all of its warrants immediately, which it could not have done under the original warrant agreements. Over the next week, Defendants also issued millions of dollars in favorable stock options to Vaxart's most senior executives.

**B.     Defendants' Materially False and Misleading Statements**

19.     On June 25, 2020, Defendants issued a press release, entitled "**Vaxart, Inc. Signs Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP**, *Enabling Production of A Billion or More COVID-19 Vaccine Doses Per Year Through Large Scale Lyophilization, Tableting and Coating,* which misleadingly suggested the Vaxart was close to production of a vaccine, stating:

> Vaxart, Inc. ("Vaxart" or the "Company"), a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, announced today that it signed a Memorandum of Understanding with Attwill Medical Solutions Sterilflow, LP ("AMS") affirming the parties' intent to establish AMS as a resource for lyophilization development and large scale manufacturing including tableting and enteric coating for Vaxart's oral COVID-19 vaccine. AMS will be assigning dedicated resources and equipment for the scale up and commercial production of the vaccine upon entering a formal agreement.
>
> "We believe AMS' experience coupled with its ability to manufacture a billion or more doses per year would be a beneficial addition to our group of CDMO partners and enable the large scale manufacturing and ultimate supply of our COVID-19 vaccine for the US, Europe and other countries in need," said Andrei Floroiu, CEO of Vaxart Inc. "We believe our oral vaccines, generated on our proven platform, have the potential to offer superior protection against airborne viruses such as SARS-CoV-2 by triggering both mucosal and systemic immunity while being administered by a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

On this news Vaxart's stock price doubled from $3.19 to $6.26 per share.

20.     On June 26, 2020, Defendants issued a press release misleadingly implying that the federal government's OWS had accepted Vaxart's supposed vaccine as part of its program. The press release, entitled "**Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**, *OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates*", stated:

> Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate ("NHP") challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.

> The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.
>
> "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa – nose, mouth or eyes – strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

On this news, Vaxart's stock price jumped from $6.26 to $8.04 per share.

21. The statements referenced in ¶¶ 19-20 were materially false and/or misleading because they misrepresented and failed to disclose material information pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded by them. Specifically, Vaxart exaggerated the prospects of its COVID-19 vaccine candidate, including its purported role or involvement in OWS. Contrary to Defendants' statements, Vaxart's COVID-19 vaccine candidate had no reasonable prospect for mass production and marketing and was not among the companies selected to receive significant financial support from OWS to produce hundreds of millions of vaccine doses. Instead, Vaxart's COVID-19 vaccine candidate was merely selected to participate in preliminary U.S. government studies to determine potential areas for possible OWS partnership and support. At the time of making the statements, those studies were ongoing, and no determination had been made.

22. Immediately following Vaxart's press release, Defendant Armistice cashed out of Vaxart. Taking full advantage of the amendments to the warrant agreements Defendants had granted on June 8, 2020, Armistice exercised its warrants to buy nearly 21 million Vaxart shares for either 30 cents or $1.10 a share. Then, between June 26th and June 29th, during only two trading days (Friday, June 26 and Monday, June 29, 2020), Armistice sold 27.6 million Vaxart shares, reducing its overall beneficial ownership in Vaxart from 29% to 0.2%, reaping profits of approximately $200 million.

23. Vaxart's false statements also positioned Defendant Floroiu and other Vaxart insiders for big pay-days as stock options granted in early June had already vested and accrued in

value.  For example, when Defendant Floroiu became chief executive in mid-June, he received stock options that were worth about $4.3 million.  A month later, those options were worth more than $28 million.

**C.    The Truth Emerges**

24. On July 25, 2020, the New York Times published an article revealing the misleading nature of Defendants' statements.  In fact, Vaxart was not one of the companies selected to receive financial support from OWS to produce hundreds of millions of vaccine doses.  The company had never developed a vaccine, and its main funder profited by over $200 million through undisclosed stock options granted just prior to the announcement.  In significant part the article read:

> Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine
>
> Well-timed stock bets have generated big profits for senior executives and board members at companies developing vaccines and treatments.
>
> On June 26, a small South San Francisco company called Vaxart made a surprise announcement: A coronavirus vaccine it was working on had been selected by the U.S. government to be part of Operation Warp Speed, the flagship federal initiative to quickly develop drugs to combat Covid-19.
>
> Vaxart's shares soared. Company insiders, who weeks earlier had received stock options worth a few million dollars, saw the value of those awards increase sixfold. And a hedge fund that partly controlled the company walked away with more than $200 million in instant profits.
>
> The race is on to develop a coronavirus vaccine, and some companies and investors are betting that the winners stand to earn vast profits from selling hundreds of millions – or even billions – of doses to a desperate public.
>
> Across the pharmaceutical and medical industries, senior executives and board members are capitalizing on that dynamic.
>
> They are making millions of dollars after announcing positive developments, including support from the government, in their efforts to fight Covid-19. After such announcements, insiders from at least 11 companies – most of them smaller firms whose fortunes often hinge on the success or failure of a single drug – have sold shares worth well over $1 billion since March, according to figures compiled for The New York Times by Equilar, a data provider.

In some cases, company insiders are profiting from regularly scheduled compensation or automatic stock trades. But in other situations, senior officials appear to be pouncing on opportunities to cash out while their stock prices are sky high. And some companies have awarded stock options to executives shortly before market-moving announcements about their vaccine progress.

The sudden windfalls highlight the powerful financial incentives for company officials to generate positive headlines in the race for coronavirus vaccines and treatments, even if the drugs might never pan out.

Some companies are attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys.

For example, the headline on Vaxart's news release declared: "Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed." But the reality is more complex.

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.

"The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart," said Michael R. Caputo, the department's assistant secretary for public affairs. "Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made."
Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

\* \* \*

Vaxart, though, is where the most money was made the fastest.

At the start of the year, its shares were around 35 cents. Then in late January, Vaxart began working on an orally administered coronavirus vaccine, and its shares started rising.

Vaxart's largest shareholder was a New York hedge fund, Armistice Capital, which last year acquired nearly two-thirds of the company's shares. Two Armistice executives, including the hedge fund's founder, Steven Boyd, joined Vaxart's board of directors. The hedge fund also purchased rights, known as warrants, to buy 21 million

more Vaxart shares at some point in the future for as little as 30 cents each.

Vaxart has never brought a vaccine to market. It has just 15 employees. But throughout the spring, Vaxart announced positive preliminary data for its vaccine, along with a partnership with a company that could manufacture it. By late April, with investors sensing the potential for big profits, the company's shares had reached $3.66 — a tenfold increase from January.

On June 8, Vaxart changed the terms of its warrants agreement with Armistice, making it easier for the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller batches.

One week later, Vaxart announced that its chief executive was stepping down, though he would remain chairman. The new C.E.O., Mr. Floroiu, had previously worked with Mr. Boyd, Armistice's founder, at the hedge fund and the consulting firm McKinsey.

On June 25, Vaxart announced that it had signed a letter of intent with another company that might help it mass-produce a coronavirus vaccine. Vaxart's shares nearly doubled that day.

The next day, Vaxart issued its news release saying it had been selected for Operation Warp Speed. Its shares instantly doubled again, at one pointing hitting $14, their highest level in years.

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated," Mr. Floroiu said.

Armistice took advantage of the stock's exponential increase – at that point up more than 3,600 percent since January. On June 26, a Friday, and the next Monday, the hedge fund exercised its warrants to buy nearly 21 million Vaxart shares for either 30 cents or $1.10 a share – purchases it would not have been able to make as quickly had its agreement with Vaxart not been modified weeks earlier.

Armistice then immediately sold the shares at prices from $6.58 to $12.89 a share, according to securities filings. The hedge fund's profits were immense: more than $197 million.

"It looks like the warrants may have been reconfigured at a time when they knew good news was coming," said Robert Daines, a professor at Stanford Law School who is an expert on corporate governance. "That's a valuable change, made right as the company's stock price was about to rise."

At the same time, the hedge fund also unloaded some of the Vaxart shares it had previously bought, notching tens of millions of dollars in additional profits.

By the end of that Monday, June 29, Armistice had sold almost all of its Vaxart shares.

> Mr. Boyd and Armistice declined to comment.
>
> Mr. Floroiu said the change to the Armistice agreement "was in the best interests of Vaxart and its stockholders" and helped it raise money to work on the Covid-19 vaccine.
>
> He and other Vaxart board members also were positioned for big personal profits. When he became chief executive in mid-June, Mr. Floroiu received stock options that were worth about $4.3 million. A month later, those options were worth more than $28 million.
>
> Normally when companies issue stock options to executives, the options can't be exercised for months or years. Because of the unusual terms and the run-up in Vaxart's stock price, most of Mr. Floroiu's can be cashed in now.
>
> Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading. The higher the shares fly, the bigger the profits.
>
> "Vaxart is disrupting the vaccine world," Mr. Floroiu boasted during a virtual investor conference on Thursday. He added that his impression was that "it's OK to make a profit from Covid vaccines, as long as you're not profiteering."

On this news, Vaxart's stock fell from $12.29 to $11.16. As this news has been digested by the market, Vaxart's stock has fallen to as low as $8.90 on August 4, 2020, and as low as $5.59 on December 29, 2020.

### UNDISCLOSED ADVERSE FACTS

25. The market for Vaxart's securities was an open, well-developed, and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Vaxart's securities traded at artificially inflated prices during the Time Period. Plaintiff purchased or otherwise acquired Vaxart's securities relying upon the integrity of the market price of the Company's securities and market information relating to Vaxart and has been damaged thereby.

26. During the Time Period, Defendants materially misled the investing public, thereby inflating the price of Vaxart's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false

and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

27. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff. As described herein, during the Time Period, Defendants made or caused to be made a series of materially false and misleading statements about Vaxart's financial well-being and prospects.

28. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements made during the Time Period resulted in Plaintiff purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

29. During the Time Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Vaxart's securities and operated as a fraud or deceit on Plaintiff by failing to disclose to him that the Company's financial results were materially misleading and misrepresented material information. Plaintiff sold Vaxart's stock short, and Defendants' misrepresentations and fraudulent conduct caused the shares to artificially spike upward to new highs which caused Plaintiff to suffer economic loss. Later, when Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Vaxart's securities fell precipitously as the prior inflation came out of the Company's stock price which confirms that Vaxart misrepresentations and/or fraudulent conduct.

30. By failing to disclose the true state of the Company's financial statements, neither Plaintiff nor other investors were aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Vaxart's business practices and

procedures. Thus, instead of truthfully disclosing during the Time Period the true state of the Company's business, Defendants caused Vaxart to conceal the truth.

31. Defendants' false and misleading statements had the intended effect and caused Vaxart's common stock to trade at artificially inflated levels throughout the Time Period. The stock price spike upwards discussed herein caused real economic loss to Plaintiff who sold the Company's securities short during the Time Period.

32. The decline in the price of Vaxart's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Vaxart's common stock price declines negates any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Vaxart's securities and the subsequent decline in the value of Vaxart's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**SCIENTER ALLEGATIONS**

33. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Time Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

34. As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vaxart, their control over, receipt and/or modification of Vaxart's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Vaxart, participated in the fraudulent scheme alleged herein.

## THE PRESUMPTION OF RELIANCE

35. At all relevant times, the market for Vaxart's common stock was efficient for the following reasons, among others:

(a) Vaxart's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Vaxart filed periodic reports with the SEC and the NASDAQ;

(c) Vaxart regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Vaxart was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

36. As a result of the foregoing, the market for Vaxart's securities reasonably and promptly digested current information regarding Vaxart from all publicly-available sources and reflected such information in the price of Vaxart's securities. Plaintiff, as a short seller and purchaser of Vaxart securities during the Time Period, suffered injury through his purchase of Vaxart securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

37. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

38. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vaxart who knew that the statement was false when made.

## CLAIMS AGAINST DEFENDANTS

## FIRST CLAIM FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER

### (Against All Defendants)

39. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

40. During the Time Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Time Period, did (i) deceive the investing public, including Plaintiff, as alleged herein; (ii) artificially inflate and maintain the market price of Vaxart securities; and (iii) cause Plaintiff to purchase Vaxart securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

41. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vaxart securities in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary

participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Vaxart, as alleged herein.

42. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vaxart securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Vaxart's finances and business prospects.

43. By virtue of their positions at Vaxart, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

44. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Vaxart, the Individual Defendants had knowledge of the details of Vaxart's internal affairs.

45. The Control Defendants and Executive Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Vaxart.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vaxart's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and

public statements, the market price of Vaxart securities was artificially inflated throughout the Time Period. In ignorance of the adverse facts concerning Vaxart's business and financial condition which were concealed by Defendants, Plaintiff purchased or otherwise acquired Vaxart securities at artificially-inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and was damaged thereby.

46. During the Time Period, Vaxart securities were traded on an active and efficient market. Plaintiff, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff, the true value of Vaxart securities was substantially lower than the prices paid by Plaintiff. The market price of Vaxart securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff.

47. Plaintiff has suffered damages in that, in reliance on the integrity of the market, Plaintiff paid artificially inflated prices for Vaxart securities, which inflation was removed from its price when the true facts became known. Plaintiff would not have purchased Vaxart securities at the prices paid, or at all, if Plaintiff had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

48. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff suffered damages attributable to the material misstatements and omissions alleged herein in connection with Plaintiff's purchases of Vaxart securities during the Time Period.

49. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**

**(Against the Control Defendants and Executive Defendants)**

50. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51. This Count is asserted by Plaintiff against the Control Defendants and Executive Defendants, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The Control Defendants and Executive Defendants were and acted as controlling persons of Vaxart within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52. In addition, each of the Control Defendants and Executive Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

53. As set forth above, the Control Defendants and Executive Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Control Defendants and Executive Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff suffered damages in connection with Plaintiff's purchases of the Company's securities during the Time Period.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiff against Defendants in an amount to be proven at trial, including interest thereon;

B. Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

C. Such other and further relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 8, 2021                               Respectfully submitted,

                                                     By:_____
                                                           Phillip Chan

                                                     Pro Se